UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| JOHNNY MORENO, | § | |
| | § | |
| Plaintiff, | § | |
| V. | § | CIVIL ACTION NO. 6:23-CV-00026 |
| | § | |
| CITY OF VICTORIA, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT

Pending before the Court is the Defendant Officers motion for summary judgment. (D.E. 42). Plaintiff is opposed. (D.E. 48).[1] After reviewing the Parties' arguments, the record, applicable law, the Court **GRANTS in part** and **DENIES in part** the Officers' motion for summary judgment.[2] (D.E. 42).

### I. Evidentiary Objections

Before recounting the facts, the Court addresses the Parties' evidentiary objections.

Plaintiff objects to the affidavits of Officers Ballard, Allen, and Balerio, (D.E. 42-2);

---

[1] Although Plaintiff's First Amended Complaint originally listed five officers as Defendants, (D.E. 39, p. 1–2), Plaintiff has since voluntarily dismissed without prejudice all claims against Officer J. Sepulveda. (D.E. 55); (D.E. 56). And, at the July 25, 2024 motion hearing, Plaintiff indicated Officer T. Herrera was mistakenly named in Plaintiff's First Amended Complaint and conceded summary judgment dismissal was proper as to Officer Herrera who was not at the scene. *See* July 25, 2024 Minute Entry. Plaintiff also clarified that Officer Smith, who was at the scene, is not a Defendant. *See id.* Accordingly, as the Court indicated at the motion hearing, this Order addresses Plaintiff's claims against the remaining three Defendants—Officers Ballard, Allen, and Balerio. The Court previously dismissed Defendants City of Victoria, Texas, Council for the City of Victoria, Victoria Police Department, and Chief Robert Arredondo. (D.E. 23, p. 15).

[2] The complaint also makes passing mention of "retaliation against [Plaintiff] for exercising his First Amendment right to protest his unlawful detention." (D.E. 39, p. 6). Plaintiff does not further articulate a First Amendment claim, *see id.*, the summary judgment briefing does not address any such claim, (D.E. 42); (D.E. 48); (D.E. 49), and—besides one passing mention of First Amendment issues at the July 25, 2024 motion hearing—Plaintiff has not pursued a First Amendment retaliation claim. The Court therefore analyzes the four claims Plaintiff has adequately pled: wrongful detention, excessive force, bystander liability, and failure to intervene.

(D.E. 42-3); (D.E. 42-4), on hearsay and personal knowledge grounds, (D.E. 48, p. 5). Plaintiff also objects to the 911 call leading officers to the scene, (D.E. 42-1, Ex. 12), on relevance grounds, (D.E. 48, p. 5). The Court overruled these objections at the motion hearing. *See* July 25, 2024 Minute Entry.

The Officers object to Plaintiff's summary judgment evidence on three grounds: Plaintiff's declarations (1) contain conclusory statements and legal conclusions, (2) are directly contradicted by the body camera footage, and (3) recount events that occurred before the officers' arrival and of which the officers had no knowledge. (D.E. 51, p. 1–2).

For purposes of the summary judgment record, the Court disregards conclusory assertions and information outside the officers' knowledge. *See Lechuga v. S. Pac. Transp. Co.*, 949 F.2d 790, 798 (5th Cir. 1992) (per curiam) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence[.]") (citation omitted); *White v. Pauly*, 580 U.S. 73, 76–77 (2017) ("Because this case concerns the defense of qualified immunity, however, the Court considers only the facts that were knowable to the defendant officers.") (citation omitted). And, whenever a party's summary judgment evidence is "blatantly contradicted by the record," the Court will—consistent with *Scott v. Harris*—"view[] the facts in the light depicted by the videotape." 550 U.S. 372, 380–81 (2007).

To the extent the Court relies on a piece of summary-judgment evidence which the Officers have objected to, the Court **OVERRULES** the objection. The Court **DENIES** as moot the Officers' objections to any evidence not specifically referenced in this order.

## II. Background

### A. Factual

Victoria Police Department ("VPD") received a 911 call on April 20, 2021, at 5:06 p.m.

reporting a man assaulting a woman in a T-Mobile parking lot off North Navarro Street. (D.E. 42-1, Ex. 12, 0:00:00–0:00:26). The caller identified the assailant as Johnny Moreno, a Mexican man with arm tattoos, wearing a white muscle shirt and black pants. *Id.* at 0:00:33–0:00:36, 0:01:17–0:01:27. The caller indicated the assailant drove a new gray car[3] with paper tags. *Id.* at 0:01:30–0:01:51. Dispatch routed Officers to the scene and provided a description of the suspect while the Officers were en route.[4] (D.E. 42-2, p. 1); (D.E. 42-3, p. 1); (D.E. 42-4, p. 1). The caller later identified herself as well. (D.E. 42-1, Ex. 12, 0:03:58–0:04:05).

Officers Trenton Ballard and Roger Balerio arrived at the scene around four minutes later. (D.E. 42-1, Ex. 8, 17:09:40–17:10:23). Officer Ballard observed a gray car with paper tags waiting behind a stop sign at the intersection of Fillmore Avenue and North Navarro Street. (D.E. 42-1, Ex. 4, 22:10:01–22:10:12); (D.E. 42-2, p. 1); (D.E. 42-4, p. 1). Officer Ballard activated his overhead emergency lights, stepped out of the patrol vehicle, and approached the passenger side of the gray car. (D.E. 42-1, Ex. 1, 17:09:37–17:10:17).

He tapped on the passenger door of Plaintiff's car and instructed Plaintiff to step out of the car. *Id.* at 17:10:18–17:10:20. Plaintiff obliged and exited the car. *Id.* at 17:10:23. He wore a white muscle shirt and dark blue pants, and he had visible arm tattoos.[5] *Id.* at 17:10:23–17:10:27. Upon

---

[3] The caller stated the car was a Chrysler. (D.E. 42-1, Ex. 12, 0:01:31–0:01:36). However, the body camera footage shows the car was a Honda. Otherwise, the caller's description of the car was accurate.

[4] At the motion hearing, the Court inquired whether any of the officers heard the 911 call. *See* July 25, 2024 Minute Entry. The Officers' counsel answered 'no' but indicated the Officers received information from the 911 call through radio dispatch. *Id.* However, because radio traffic in the dispatch made it difficult to follow who conveyed what information to whom, the Officers' counsel opted to provide the 911 call recording rather than the dispatch audio. *See* (D.E. 42-1, Ex. 12). For purposes of summary judgment, the Court is satisfied by the Officers' affidavits, which indicate they all received the suspect's description while en route.

[5] At the motion hearing, Plaintiff's counsel suggested that the 911 caller's description of Plaintiff's clothing was inaccurate. As stated above, the 911 caller indicated that Plaintiff wore black pants. (D.E. 42-1, Ex. 12, 0:00:33–0:00:36, 0:01:17–0:01:26). However, the body camera footage shows that Plaintiff wore dark blue jeans. (D.E. 42-1, Ex. 1, 17:10:23–17:10:27). Otherwise, the 911 caller's description of Plaintiff was accurate—for example, Plaintiff's white muscle shirt and visible arm tattoos. *Id.*

exiting the vehicle, Plaintiff instructed Officer Ballard that he "didn't do nothing," walked away from the vehicle, faced away from Officer Ballard, and stated "right here behind my back" as he placed his hands behind his back with his head down. *Id.* at 17:10:25–17:10:27.

As Officer Ballard began handcuffing Plaintiff, Plaintiff stated, "put them on. Do it." *Id.* at 17:10:31–17:10:35. Meanwhile, Officer Balerio had exited the patrol vehicle, and as he walked by, he said, "Just throw him in cuffs. If he wants to be in cuffs, put him in cuffs." (D.E. 42-1, Ex. 8, 17:10:29–17:10:32). After handcuffing Plaintiff, Officer Ballard removed a pocketknife from the front-right pocket of Plaintiff's pants. *Id.* at 17:10:38–17:10:41.

Officers Royall Allen and Joseph Smith[6] responded to the scene in a second patrol vehicle. (D.E. 42-1, Ex. 5, 17:10:22–17:10:29); (D.E. 42-1, Ex. 11, 17:10:26–17:10:34). Officer Smith approached Ms. Jennifer Sendejo, the driver of the vehicle and Plaintiff's girlfriend, while Officer Allen joined Officers Ballard and Balerio near Plaintiff. (D.E. 42-1, Ex. 5, 17:10:31–17:10:44); (D.E. 42-1, Ex. 11, 17:10:28–17:10:35).

Officer Ballard then held onto Plaintiff's right arm and walked him towards Officer Ballard and Balerio's patrol vehicle. (D.E. 42-1, Ex. 1, 17:10:41–17:10:51). Plaintiff told Officer Ballard, "Don't pull on me like that," *id.* at 17:10:41–17:10:43; (D.E. 42-1, Ex. 5, 17:10:41–17:10:43), to which Officer Balerio responded, "Chill out. Either he does it, or I pull you. Just come over here and talk to us." (D.E. 42-1, Ex. 1, 17:10:45–17:10:50). As he was escorted to the vehicle, Plaintiff expressed his discontent at the officers moving him while he was in handcuffs. *Id.* at 17:10:46–17:10:53. He yanked his right arm free from Officer Ballard's grasp, spun around, and yelled at the officers, "you didn't have to do all that shit, dog." *Id.* at 17:10:51–17:10:53. In response,

---

[6] Officer Smith is not a Defendant in this matter. *See supra* note 1.

Officer Allen grabbed Plaintiff's left arm and pushed him towards the patrol car. *Id.* at 17:10:53–17:10:56. Officer Balerio regained control of Plaintiff's right arm and shoved him against the vehicle. *Id.* at 17:10:54–17:10:56. Officer Balerio placed his left hand on the back of Plaintiff's neck and held him pressed against the vehicle. *Id.* at 17:10:55–17:10:57.

After frisking Plaintiff against the vehicle, Officers Allen and Balerio turned him around and forced him to the ground in the grass by the nearby curbside. *Id.* at 17:10:58–17:10:03. As Officers Allen and Balerio brought him to the ground, Officer Allen pushed his right elbow into Plaintiff's back and Plaintiff yelled, "all right, all right." *Id.* at 17:10:59–17:11:02. Both officers landed awkwardly on Plaintiff. *Id.* at 17:11:02–17:11:04. Upon impact, Plaintiff exclaimed, "Ah, you motherfucker, you broke my neck." *Id.* at 17:11:05–17:11:06. He continued, repeating six more times that Officers had broken his neck and that he was not lying. *Id.* at 17:11:06–17:11:16.

Despite Plaintiff's pleas about his neck, Officer Balerio repeatedly instructed Plaintiff to sit up. *Id.* at 17:11:17–17:11:19; (D.E. 42-1, Ex. 5, 0:01:33–0:01:41). In response, Plaintiff stated, "I'm not moving. Get me an ambulance." (D.E. 42-1, Ex. 1, 17:11:19–17:11:22); (D.E. 42-1, Ex. 5, 17:11:20–17:11:22). Over protests from Plaintiff, Officer Balerio lifted him into a seated position. (D.E. 42-1, Ex. 1, 17:11:26–17:11:30); (D.E. 42-1, Ex. 5, 17:11:27–17:11:29). Plaintiff shouted in pain, repeatedly stating "my neck." (D.E. 42-1, Ex. 1, 17:11:28–17:11:31); (D.E. 42-1, Ex. 5, 17:11:28–17:11:30). Officer Balerio leaned Plaintiff back onto the ground and said, "Okay then, lay there." (D.E. 42-1, Ex. 1, 17:11:31–17:11:32); (D.E. 42-1, Ex. 5, 17:11:30–17:11:32).

Twelve minutes after Plaintiff initially asked for an ambulance,[7] officers requested EMS.

---

[7] In the Officers' motion for summary judgment, (D.E. 42), and the officers' affidavits, (D.E. 42-2); (D.E. 42-3); (D.E. 42-4), the Officers assert EMS was "immediately requested." (D.E. 42, p. 3); (D.E. 42-2, p. 2); (D.E. 42-3, p. 2); (D.E. 42-4, p. 2). This is directly contradicted by the video footage.

*Compare* (D.E. 42-1, Ex. 8, 17:11:21–17:11:22), *with* (D.E. 42-1, Ex. 4, 22:23:09–22:23:23).[8]

EMS arrived to assess Plaintiff's neck at approximately 5:31 p.m. (D.E. 42-1, Ex. 2, 17:31:51–17:31:58). Plaintiff refused treatment. (D.E. 42-1, Ex. 3, 17:33:22–17:33:53) (repeatedly instructing EMS to "let it go," "get away," and "get out of here"); *see also* (D.E. 48-1, p. 4) ("I decided to make the decision of having my wife take me instead of EMS because they were aggressive and unhelpful to me."); (D.E. 48-2, p. 4) (Ms. Sendejo declaring she heard Plaintiff deny EMS's assistance "because he didn't feel safe due to the way they handled him."). After Officer Balerio released Plaintiff from his handcuffs, (D.E. 42-1, Ex. 10, 17:37:41–17:37:57), Ms. Sendejo drove Plaintiff to the hospital. (D.E. 48-1, p. 4; D.E. 48-2, p. 4). At the hospital, Plaintiff received a CT scan, which revealed he had sustained a fracture in his neck at the C6 vertebra. (D.E. 48-3, p. 3, 5–11).

### B. Procedural

Plaintiff filed suit under 42 U.S.C. § 1983 against the Officers who used force against him—Officers Ballard, Allen, and Balerio. (D.E. 39, p. 1–2, 5–7).[9] Plaintiff argues that the officers (1) engaged in an unconstitutional use of excessive force, (2) failed to intervene to prevent this constitutional violation, and (3) were deliberately indifferent in failing to provide adequate medical

---

[8] The Court notes that the patrol vehicle's footage's time stamps do not exactly match the remaining footage. *See* (D.E. 42-1, Ex. 4). In comparing the footage to the remaining video evidence, the hour time stamp differs from the remaining footage, but the minute stamp does not.

[9] Plaintiff's First Amended Complaint lists five officers as Defendants. Plaintiff has since voluntarily dismissed without prejudice all claims against Officer J. Sepulveda. (D.E. 55); (D.E. 56). And, at the July 25, 2024 motion hearing, Plaintiff indicated Officer Herrera was mistakenly named in Plaintiff's First Amended Complaint and conceded summary judgment dismissal was proper as to Officer Herrera because he was not at the scene. *See* July 25, 2024 Minute Entry. Plaintiff also conceded that Officer Smith, who was at the scene, is not a Defendant. *See id.* Accordingly, as the Court indicated at the motion hearing, this Order addresses Plaintiff's claims against the three remaining Defendants—Officers Ballard, Allen, and Balerio. The Court previously dismissed Defendants City of Victoria, Texas, Council for the City of Victoria, Victoria Police Department, and Chief Robert Arredondo. (D.E. 23).

6 / 27

care. (D.E. 39, p. 5–7).[10] In response, the officers raised a qualified immunity defense and subsequently filed the pending motion for summary judgment, (D.E. 42, p. 4–5), to which Plaintiff filed a response and objected to certain summary judgment evidence. (D.E. 48). The Officers filed a timely reply in support of their motion for summary judgment, (D.E. 49), and filed a response to Plaintiff's objections to the summary judgment evidence. (D.E. 50). The Officers subsequently objected to Plaintiff's summary judgment evidence. (D.E. 51).

### III. Law

#### A. Summary Judgment Standard

Summary judgment is proper when the moving party demonstrates "there is no genuine dispute as to *any* material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). A fact is material when it could "affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Courts view all evidence "in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013).

Even at the summary judgment stage, courts assign greater weight to the "video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011). If captured on video, factual allegations should be viewed "in the light depicted by the video tape." *Scott v.*

---

[10] The complaint also contains a passing mention of "retaliation against [Plaintiff] for exercising his First Amendment right to protest his unlawful detention." (D.E. 39, p. 6). Plaintiff does not further articulate a First Amendment claim, *see id.*, the summary judgment briefing does not address any such claim, (D.E. 42); (D.E. 48); (D.E. 49), and—besides one passing mention of First Amendment issues at the July 25, 2024 motion hearing—the Court has no indication that Plaintiff intends to bring a First Amendment retaliation claim. Accordingly, the Court concludes Plaintiff is not alleging a First Amendment retaliation claim.

*Harris*, 550 U.S. 372, 381 (2007). When adversarial parties provide two different versions of the facts, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

### B. Qualified Immunity Standard

Qualified immunity alters the summary judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Once an officer asserts the qualified immunity defense, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* "[A]ll inferences are still drawn in the plaintiff's favor." *Id.*

Qualified immunity is a two-prong inquiry: first, whether the officer's conduct violated the plaintiff's statutory or constitutional right, and second, whether that right was "clearly established" at the time of the violation. *McVae v. Perez*, 120 F.4th 487, 492 (5th Cir. 2024). The second prong of the qualified immunity analysis "is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citation modified). Courts are permitted to address these steps in either order or do not need to reach both if one proves dispositive. *Dawes v. City of Dallas*, No. 22-10876, 2024 WL 2268529, at *1 (5th Cir. May 20, 2024) (per curiam) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

### IV. Analysis

### A. Due Process Claim

Starting with Plaintiff's due process claim, Plaintiff alleges that the officers "violated

Plaintiff's right to due process when he was detained for no reason." (D.E. 39, p. 6). Because this alleged violation of due process stems from Plaintiff's alleged wrongful detention, the Court finds that the Fourth Amendment—rather than the Fourteenth Amendment—is the proper vehicle for this claim. *See Manuel v. City of Joliet*, 580 U.S. 357, 360 (2017) ("The Fourth Amendment, this Court has recognized, establishes 'the standards and procedures' governing pretrial detention." (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975))); *Blackwell v. Barton*, 34 F.3d 298, 302 (5th Cir. 1994) ("We hold that [plaintiff's] section 1983 claim against [defendant] for illegal arrest and detention is properly considered under the Fourth Amendment, the more specific constitutional right implicated by [plaintiff's] allegations."). As such, the Court **DISMISSES** Plaintiff's due process claim under the Fourteenth Amendment for failing to state a claim. *See Araguz v. Clinton*, No. 1:18-CV-148, 2019 WL 1046865, at *9–10 (S.D. Tex. Jan. 9, 2019) (Torteya, III, Mag. J.), *adopted*, 2019 WL 1041337, at *1 (S.D. Tex. Mar. 5, 2019) (Olvera, J.).

### B. Wrongful Detention Claim

Turning to Plaintiff's Fourth Amendment wrongful detention claim, the Court finds summary judgment is proper under the first prong of qualified immunity because Plaintiff has not raised a genuine issue of material fact whether the Officers' conduct violated his constitutional right to be free from unreasonable seizures. The Officers did not violate Plaintiff's Fourth Amendment right to be free from unreasonable seizures when stopping him or placing him in handcuffs.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. The Fifth Circuit has articulated the Fourth Amendment's protection against warrantless arrests as follows:

> A warrantless arrest must be based on probable cause. Probable cause to arrest exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed.

*Sauceda v. City of San Benito*, 78 F.4th 174, 183 (5th Cir. 2023) (citation modified). Put differently, "[t]he constitutional claim of false arrest requires a showing of no probable cause." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (citation omitted). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

Courts consider different factors for investigative stops. *See Terry v. Ohio*, 392 U.S. 1 (1968). Courts examine: "(1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Rosales-Giron*, 592 F. App'x 246, 250 (5th Cir. 2014) (quoting *United States v. Stevens*, 487 F.3d 232, 244 (5th Cir. 2007)); *see Terry*, 392 U.S. at 19–20.

"For a [] stop to be justified at its inception, an officer need only have reasonable suspicion that 'some sort of illegal activity . . . occurred, or is about to occur, before [making the stop].'" *Rosales-Giron*, 592 F. App'x at 250 (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). Reasonable suspicion is "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *United States v. Darrell*, 945 F.3d 929, 932 (5th Cir. 2019) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Reasonable suspicion requires less than probable cause but "more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (internal quotations omitted) (quoting *Terry*, 392 U.S. at 27). To determine whether reasonable suspicion exists, courts "look at

10 / 27

the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

To comply with *Terry*'s scope requirement, stops "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc) (first citing *United States v. Dortch*, 199 F.3d 193, 200 (5th Cir. 1999); and then citing *United States v. Machuca-Barrera*, 261 F.3d 425, 434 (5th Cir. 2001)).

The Officers move for summary judgment on Plaintiff's wrongful detention claim, arguing the detention was justified by either (1) reasonable suspicion to detain Plaintiff to investigate the 911 call or (2) Plaintiff's request to be put in handcuffs. (D.E. 42, p. 14–15). Alternatively, the Officers argue the law is not clearly established that an officer would lack probable cause or reasonable suspicion to detain a person suspected of physically assaulting a female. *Id.* at 15–16. In response, Plaintiff argues he was wrongfully detained because (1) the Officers never articulated their belief that Plaintiff was committing a crime and (2) there were no specific and articulable facts demonstrating that a crime had been or was going to be committed. (D.E. 48, p. 16–17).

As a threshold issue, the Court must determine whether the Officers "arrested" Plaintiff or merely "detained" him, as that distinction governs whether the Officers needed probable cause or reasonable suspicion. The Parties vacillate between the terms "arrest" and "detention" and the related probable cause and reasonable suspicion standards. *See* (D.E. 42, p. 14–16); (D.E. 48, p. 15–17). The Court, however, understands Plaintiff to argue that the Officers wrongfully detained him, *see* (D.E. 48, p. 15–17), as he cites the *Terry* standard when responding to the Officers' motion for summary judgment, *id.* at 16, and pleads this claim as one of wrongful detention, rather

11 / 27

than wrongful arrest, *see* (D.E. 39, p. 5–6). The Court therefore applies *Terry*'s reasonable suspicion framework.

Considering Plaintiff's argument and *Terry*'s reasonable suspicion standard, the Court finds the Officers had reasonable suspicion to detain Plaintiff. First, the VPD received a 911 call reporting a man violently assaulting a woman in a T-Mobile parking lot off North Navarro Street. (D.E. 42-1, Ex. 12, 0:00:00–0:00:26). The caller identified Plaintiff as the assailant, specifying he was a Mexican man with arm tattoos dressed in a white muscle shirt and black pants. *Id.* at 0:00:33–0:00:36, 0:01:17–0:01:26. The caller indicated the assailant was driving a new gray car with paper tags. *Id.* at 0:01:30–0:01:51. Officer Ballard observed a gray car with paper tags waiting behind a stop sign at the intersection of Fillmore Avenue and North Navarro Street. (D.E. 42-1, Ex. 4, 22:10:01–22:10:12); (D.E. 42-2, p. 1); (D.E. 42-4, p. 1). Upon approaching the vehicle, (D.E. 42-1, Ex. 1, 17:09:37–17:10:17), and at Officer Ballard's request, Plaintiff stepped out of the car. *Id.* at 17:10:18–17:10:23. Plaintiff matched the caller's description—a Mexican man with visible arm tattoos dressed in a white muscle shirt and dark pants. *Id.* at 17:10:23–17:10:27. Further, Plaintiff was accused of assaulting a woman, and Ms. Sendejo, a woman, was driving the vehicle. (D.E. 42-1, Ex. 5, 17:10:31–17:10:44); (D.E. 42-1, Ex. 11, 17:10:28–17:10:35). Finally, the 911 caller identified herself by name to dispatch. (D.E. 42-1, Ex. 12, 0:03:58–0:04:05).

Consistent with these facts, the Court finds Plaintiff fails to demonstrate there is a genuine dispute of material fact as to whether the Officers had reasonable suspicion to detain Plaintiff. The 911 call possessed "sufficient indicia of reliability to provide reasonable suspicion to justify" detaining Plaintiff. *Cf. United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008) (finding a 911 call supported reasonable suspicion when an eyewitness caller identified themselves as the victim, described the criminal conduct, and described the alleged criminal); *see also United States v.*

12 / 27

*Gomez*, 623 F.3d 265, 269 (5th Cir. 2010) (describing the indicia of reliability factors for determining whether a 911 call creates reasonable suspicion).[11] Accordingly, the Court **GRANTS** the Officers' motion for summary judgment on Plaintiff's wrongful detention claim.

### B. Excessive Force Claim

Plaintiff next claims Officers Ballard, Allen, and Balerio used excessive force on him. (D.E. 39, p. 5). Specifically, Plaintiff alleges the officers "grabb[ed] [Plaintiff] and slamm[ed] him to the ground[.]" *Id.* Plaintiff also contends Officers Allan and Balerio "pulled him towards the squad car, and slammed [him] against the car, then threw [Plaintiff] on the ground." *Id.* at 3.

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "The Fourth Amendment provides protections against an officer's use of excessive force to effect an arrest or other seizure." *Aguirre v. City of San Antonio*, 995 F.3d 395, 406 (5th Cir. 2021). To prevail on an excessive force claim, the plaintiff must show "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (citation omitted). The Fifth Circuit has described the interrelatedness of the last two elements:

> The second and third elements collapse into a single objective-reasonableness inquiry, guided by the following *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) (quoting *Graham v. Connor*,

---

[11] Because Plaintiff fails to demonstrate a genuine dispute of material fact as to reasonable suspicion, the Court does not reach the Officers' alternative arguments that Plaintiff consented to handcuffs or that their actions did not violate clearly established law.

490 U.S. 386, 396 (1989)) (internal citation omitted).

This objective-reasonableness inquiry "depends on 'the facts and circumstances of each particular case.'" *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018) (citation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The Fifth Circuit has clarified how this objective-reasonableness inquiry operates within the two-pronged framework for assessing qualified immunity:

> [T]he qualified immunity analysis in an excessive force case involves two distinct reasonableness inquiries. One is whether the officer's use of force was objectively reasonable in light of Fourth Amendment standards. The other is whether the right was clearly established such that a reasonable officer would know that the particular level of force used was excessive. While the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force used in a given situation may not have been clear to a reasonable officer at the scene.

*Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2000) (internal footnotes omitted). On the second prong of qualified immunity, "[a] case directly on point is not required to show that it is clearly established that certain force is a constitutional violation; nonetheless, existing precedent must define the contours of the right in question with a high degree of particularity." *Bone v. Dunnaway*, 657 F. App'x 258, 264 (5th Cir. 2016) (per curiam) (quoting *Hogan*, 722 F.3d at 735) (internal quotation marks omitted) (citation modified).

The Officers argue they are entitled to qualified immunity on this claim because (1) the officers' use of force was reasonable or (2) the officers' use of force, even if unreasonable, did not violate clearly established law. (D.E. 42, p. 10–13). Plaintiff argues the opposite on both points.

(D.E. 48, p. 8–13). The Court addresses each argument in turn.

### i. Constitutional Violation

As previously discussed, the *Graham* factors govern the Court's analysis as to excessive force. First, the Court considers the severity of the crime at issue. *Baker v. Coburn*, 68 F.4th 240, 247 (5th Cir. 2023) (citing *Graham*, 490 U.S. at 396). Second, "whether the suspect pose[d] an immediate threat to the safety of the officers or others[.]" *Id.* And third, "whether a suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Court addresses each factor below.

### a. Severity of the Crime

"When considering the severity of a crime under *Graham*, courts will normally consider the inherent violence of the offense." *Campbell v. City of Indianola*, 117 F. Supp. 3d 854, 869 (N.D. Miss. 2015) (Brown, J.) (first citing *Schmidt v. Texas*, No. 08-cv-1696, 2009 WL 7808953, at *11 (S.D. Tex. Aug. 17, 2009) (Ellison, J.), and then citing *Ray v. City of Columbus*, No. 1:09-cv-213, 2011 WL 3629225, at *3 (N.D. Miss. Aug. 17, 2011) (Aycock, J.)). Here, Plaintiff was suspected of a violent crime. The 911 call that led the Officers to the scene involved allegations that a man, matching Plaintiff's description, was beating a woman in a T-Mobile parking lot. (D.E. 42-1, Ex. 12, 0:00:00–0:01:26). Assaulting a woman is inherently violent. *Cf. Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) ("DUI is a serious offense, . . . so that factor favors [defendant]." (internal citation omitted)); *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018) ("If DUI is serious, then *a fortiori* so is felony assault."). Accordingly, this factor weighs in favor of the Officers.

### b. Immediate Threat

The second *Graham* factor considers whether the suspect poses an immediate threat to the

15 / 27

safety of the officers or others. 490 U.S. at 396. The Officers contend Plaintiff was an immediate threat because (1) based on the 911 call, the Officers reasonably believed Plaintiff was a threat to Ms. Sendejo, and (2) once Plaintiff actively resisted, he was a threat to the Officers and himself, "given that he [was] handcuffed and [near] a busy street with lots of traffic [nearby] in the event [Plaintiff] attempted to run from the Officers." (D.E. 42, p. 11).

The video evidence mitigates against these arguments. As to the Officers' first contention, any perceived threat to Ms. Sendejo decreased as the Officers directed Plaintiff away from her. Additionally, Ms. Sendejo was accompanied by an officer, who stayed near her throughout the encounter, ensuring her safety. Upon exiting the vehicle, Plaintiff immediately placed his hands behind his back to be handcuffed. Throughout the ensuing interaction, Plaintiff is handcuffed and surrounded by three officers, so whether Plaintiff posed an immediate threat to the officers or himself is a factual question and must be viewed in Plaintiff's favor at this stage of the litigation. Furthermore, the knife that was initially on Plaintiff's person cannot serve as a justification for viewing Plaintiff as an immediate threat as Officer Balerio had already removed the knife from Plaintiff's person prior to the alleged use of excessive force.

The Court therefore finds this factor marginally weighs in favor of Plaintiff.

### c. Actively Resisting Arrest or Evading Arrest by Flight

The third *Graham* factor considers whether the suspect is actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396. In granting or denying a summary judgment motion, the district court should outline the "factual scenario it believes emerges from viewing the summary judgment evidence in the light most favorable" to the nonmovant. *See White v. Balderama I*, 153 F.3d 237, 242 (5th Cir. 1998).

Plaintiff and the Officers dispute whether Plaintiff was actively resisting at the time the

16 / 27

Officers took him to the ground. *Compare* (D.E. 42-2, p. 2) (the Officers contending Plaintiff used his legs to push off the patrol unit), *with* (D.E. 48-1, p. 2–3) (Plaintiff contending he did not push off the patrol car with his legs, and thus, was not actively resisting at the time Officers took him to the ground).

The Officers argue that when Plaintiff was placed against the patrol vehicle, he was actively resisting by trying "to push away from the vehicle with his leg." (D.E. 42, p. 11–12). Contrary to the Officers' assertions, however, the video evidence does not conclusively show Plaintiff was actively resisting at the time he was apprehended against the vehicle and immediately prior to the Officers using force. *See* (D.E. 42-1, Ex. 5, 17:10:56–17:10:59); (D.E. 42-1, Ex. 8, 17:10:56–59). "[W]hen video evidence is ambiguous or incomplete, the modified rule from *Scott v. Harris* has no application." *Crane v. City of Arlington*, 50 F.4th 453, 462 (5th Cir. 2022). "[A] court should not discount the nonmoving party's story ***unless the video evidence provides so much clarity that a reasonable jury could not believe his account***." *Id.* (emphasis added). Therefore, resolving all factual disputes in favor of Plaintiff, the Court finds that a fact issue remains as to whether Plaintiff was actively resisting when the Officers took him to the ground.

The Officers also contend that Plaintiff actively resisted arrest throughout the encounter and that his resistance justified taking Plaintiff to the ground. (D.E. 42, p. 11–12). That Plaintiff actively resisted before the Officers used force, however, is insufficient to demonstrate he was resisting at the time force was used. *Robles v. Ciarletta*, 797 F. App'x 821, 826 (5th Cir. 2019) (per curiam) (citing *Bush v. Strain*, 513 F.3d 492, 496, 502 (5th Cir. 2008)). Rather, there must be some indication that Plaintiff resisted *at the time force was used* against him. *See id.* In viewing the facts in the light most favorable to Plaintiff, a jury could determine that Plaintiff was not resisting at the time force was used, and that he did not push against the patrol car with his leg or otherwise

17 / 27

actively resist once he was pressed against the squad car. (D.E. 48-1, p. 3). As such, a genuine dispute of material fact remains as to whether the Officers' use of force was excessive in proportion to the threat Plaintiff presented.

Therefore, two of the three *Graham* factors—the question of fact as to the immediacy of the threat and Plaintiff's resistance—weigh in Plaintiff's favor.

### ii. Clearly Established Law

The Court proceeds to the second prong of qualified immunity—whether the Officers' conduct violated clearly established law. Plaintiff cites three cases to argue that the Officers' conduct violated clearly established law: *Bone v. Dunnaway*, 657 F. App'x 258 (5th Cir. 2016) (per curiam), *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017), and *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008). (D.E. 48, p. 7–12). The Officers respond that Plaintiff's cited cases do not clearly establish that a reasonable officer would understand the Officers' conduct here to be an unconstitutional use of force. (D.E. 49, p. 5). The Officers frame Plaintiff's cited authorities as "a few cases where officers used more force against suspects of much less serious crimes than the violent assault of a female that Plaintiff was suspected of having committed." *Id.* at 7. The Court considers each case in turn and concludes these cases establish the right to be free from excessive force in sufficiently factually similar contexts to put a reasonable officer on notice that the Officers; conduct would constitute excessive force. *See Ashcroft*, 563 U.S. at 741; *see also Vincent*, 805 F.3d at 547 ("[T]he inquiry must focus on whether a right is clearly established as to the specific facts of the case." (citing *Brosseau*, 543 U.S. at 198)).

First, Plaintiff cites extensively from *Bone*. In *Bone*, the plaintiff was interacting with police officers for a suspected nonviolent offense. 657 F. App'x at 259–60. The officers asked plaintiff to sign a summons to appear in court. *Id.* Plaintiff refused, asserted she had done nothing

18 / 27

wrong, and turned to walk away. *Id.* Without warning that plaintiff could be arrested if she did not sign the summons, one of the officers "'forcefully' grabbed [plaintiff] and 'violently' slammed her face against a nearby window." *Id.*

The Fifth Circuit held the officer who slammed plaintiff's face against the window was not entitled to qualified immunity on plaintiff's excessive force claim. *Id.* at 264. On the first prong of qualified immunity, the Fifth Circuit concluded, "there is a genuine dispute as to whether any *Graham* factor justified [defendant's] use of force[.]" *Id.* at 263. Specifically, the suspected crime was "very minimal," there was no evidence plaintiff was an immediate threat to anyone's safety, and—viewing the evidence in the light most favorable to plaintiff—there was a genuine dispute of material fact whether she was evading arrest. *Id.*

On the second prong of qualified immunity, the Fifth Circuit remarked:

> Given that this case does not involve a serious crime, any perception that the suspect posed a risk of injury to anyone, or any active physical "resistance," the only possible justification for the use of force was [defendant's] perception that [plaintiff] was "fleeing" at the time of the use of force[.]

*Id.* Taking the plaintiff's account of events as true, and finding she was not resisting arrest or attempting to flee when officers used force in effectuating her arrest, the Court found the defendant's conduct would have violated clearly established law. *See id.* at 264.

Second, Plaintiff cites *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017). In *Hanks*, an officer pulled over plaintiff for a traffic offense. 853 F.3d at 741. Throughout the encounter, plaintiff was nonviolent, displayed his empty hands, and—despite looking over his shoulder to ask if he was under arrest—generally complied with the officer's commands. *Id.* at 742, 746. The officer had his taser trained on plaintiff. *Id.* at 743. Plaintiff "made a small lateral step with his left foot" while "his empty hands remained surrendered behind his back." *Id.* at 742. "Almost simultaneously with [plaintiff's] small step, [the officer] rushed towards [plaintiff] and administered a blow to

19 / 27

[plaintiff's] upper back or neck." *Id.* at 743. Plaintiff's upper body collided with the trunk of his vehicle from the force of the blow. *Id.* The officer maintained physical contact with plaintiff when he shifted to the ground. *Id.* Plaintiff lay face-down on the ground, placed his hands behind his back, and offered no resistance as the officer handcuffed him. *Id.*

The Fifth Circuit held the officer was not entitled to qualified immunity on plaintiff's excessive force claim. *Id.* at 750. On the first prong of qualified immunity, the Fifth Circuit analyzed each of the *Graham* factors and determined the incident involved a minor traffic violation, no immediate threat, and no active resistance or attempt to flee. *Id.* at 745–46. On the second prong, the Fifth Circuit concluded the officer's conduct violated clearly established law, reasoning, "[w]here, as here, an individual stopped for a minor traffic offense offers, at most, passive resistance and presents no threat or flight risk, abrupt application of physical force rather than continued verbal negotiating (which may include threats of force) is clearly unreasonable and excessive." *Id.* at 748.

Third, Plaintiff cites *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008). In *Bush*, the plaintiff committed battery by throwing ice water at someone else. 513 F.3d at 496. Defendant, a detective, attempted to arrest plaintiff. *Id.* Plaintiff initially resisted arrest but then, on her account, stopped resisting once fully in handcuffs. *Id.* Then, on plaintiff's account, the defendant "placed his hand behind her neck and head and forced her face into the rear window of a nearby vehicle, injuring her jaw and breaking two of her teeth." *Id.* Analyzing the plaintiff's claim for excessive force based on the force applied after she was fully restrained, the Fifth Circuit held the defendant was not entitled to qualified immunity. *Id.* at 500–02. On the first prong of qualified immunity, the court's reasoning focused on defendant "forcefully slamm[ing] [plaintiff]'s face into a vehicle when [plaintiff] was handcuffed and subdued." *Id.* at 501. On the second prong of qualified immunity,

20 / 27

the court similarly reasoned the defendant "should have known that he could not forcefully slam [plaintiff]'s face into a vehicle while she was restrained and subdued." *Id.* at 502.

The instant facts are sufficiently similar such that a reasonable officer is on notice that the Officers' use of force would be excessive. *Boone* makes clear that officers use excessive force when they slam against a wall a plaintiff who is not in handcuffs, not resisting arrest, and not attempting to flee. 657 F. App'x at 263–64. In *Hanks*, the Fifth Circuit recognized the suspect's lateral step, after generally complying with the officer's commands and not otherwise resisting arrest or attempting to flee, did not warrant the officer administering a blow to the plaintiff's upper back or neck and maintaining that contact as he took the plaintiff to the ground. 853 F.3d at 741–48.

And finally, in *Bush*, the plaintiff committed a violent crime and initially resisted arrest. *Id.* at 496. Then, the plaintiff stopped resisting arrest once in handcuffs. *Id.* After fully restraining the plaintiff, the defendant forced the plaintiff's face into a window of a vehicle, injuring her and breaking two of her teeth. *Id.* Given that the plaintiff was fully restrained and not resisting arrest at the time force was used, forcefully slamming the plaintiff into a vehicle's window constituted excessive force. *Id.* at 500–02.

Here, like *Bone*, *Hanks*, and *Bush*, and viewing the facts in the light most favorable to Plaintiff, a jury could determine that Plaintiff was not resisting arrest or attempting to flee at the time officers utilized force against him. As in *Bush*, Plaintiff was suspected of committing a violent crime, initially resisted arrest, and was restrained at the time force was used. And, as in *Hanks*, Plaintiff was generally, although not fully, compliant with the Officers' commands before the Officers used force against him.

In sum, all three cases are factually similar to the instant case and material to the *Graham*

21 / 27

factors. Accordingly, they constitute clearly established law with respect to the force used on Plaintiff. Viewing the facts in the light most favorable to Plaintiff, the Officers would have violated clearly established law when they slammed him into the ground after placing him in handcuffs, if he no longer presented an ongoing threat to the officers or the public. The Officers are not entitled to qualified immunity, so the Court **DENIES** the Officers' motion for summary judgment as to Plaintiff's excessive force claim.

### C. Bystander Claim

Next, Plaintiff claims the officers are liable on a bystander theory for watching the other officers' use of excessive force without intervening. (D.E. 39, p. 5). The Officers are entitled to qualified immunity on this claim because Plaintiff fails to meet his burden to show the Officers violated clearly established law by not intervening.

"[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (collecting cases). Bystander liability attaches when an officer "(1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph v. Bartlett*, 981 F.3d 319, 341 (5th Cir. 2020). The Court also considers whether the officer "'acquiesced in the alleged constitutional violation." *Whitley v. Hanna*, 726 F.3d 631, 647 (5th Cir. 2013) (quoting *Hale*, 45 F.3d at 919) (alteration omitted). Bystander liability for an officer's use of force arises "only where the plaintiff can allege and prove 'another officer's use of excessive force." *Kitchen v. Dallas County*, 759 F.3d 468, 481 (5th Cir. 2014) (first quoting *Hale*, 45 F.3d at 919; then citing *Whitley*, 726 F.3d at 646; and then citing *Elliot v. Linnell*, 269 F. App'x 450, 451 (5th Cir. 2008)), *abrogated on other grounds by*

22 / 27

*Kingsley v. Hendrickson*, 576 U.S. 389, 391–92 (2015).

Although Plaintiff cites the general rules for bystander liability and, more specifically, the bystander liability rules in excessive force cases, he does not provide the Court with any cases establishing that any reasonable officer would have known to intervene under the factual circumstances that confronted the Officers. *See* (D.E. 48, p. 13–14). Accordingly, without either a case from Plaintiff showing clearly established law or an argument that this case is an obvious instance of bystander liability, the Court must grant summary judgment. *See Joseph*, 981 F.3d at 345 (granting summary judgment on qualified immunity grounds where plaintiffs did "not identify a single case to support the argument that any reasonable officer would have known to intervene under these circumstances").

Accordingly, the Court **GRANTS** the Officers' motion for summary judgment as to Plaintiff's § 1983 bystander liability claims on the second prong of qualified immunity.

**D. Deliberate Indifference Claim**

Finally, Plaintiff claims the Officers violated his rights under the Fourth and Fourteenth Amendments through deliberate indifference to his medical needs. (D.E. 39, p. 6–7). Specifically, he asserts that, despite his severe injury, "no officer on the scene provided any first aid medical care" to treat the injury they had caused. *Id.* at 6. He further alleges "EMS was called then canceled and another unit was called. The EMS tech was aggressive towards [Plaintiff] also, so he declined medical assistance out of fear." *Id.* at 7. Plaintiff concludes that the Officers' decision to "ignore[e] the medical needs of [Plaintiff] violated his constitutional rights[.]" *Id.*

The Fourteenth Amendment is the source of a pretrial detainee's constitutional right to medical care and safety. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996). A pretrial detainee's due process rights are "at least as great as the Eighth Amendment protections available

23 / 27

to a convicted prisoner." *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). For claims regarding a pretrial detainee's right to medical care and safety, the Fifth Circuit has adopted the standard of deliberate indifference articulated by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). *Hare*, 74 F.3d at 643, 648. Under this standard, "liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id.* at 650. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Farmer*, 511 U.S. at 837.

The Fifth Circuit has repeatedly remarked that mere negligence in responding to a pretrial detainee's medical rights is not enough to establish liability. *E.g.*, *Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016) ("What is clear is that, even if an officer responds without the due care a reasonable person would use—such that the officer is only negligent—there will be no liability."); *Hare*, 74 F.3d at 645 ("These cases demonstrate that the constitutional standard of conduct must step up from negligence—that it must be more than mere or even gross negligence."). Indeed, "[d]eliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001); *Sanchez v. Young County*, 866 F.3d 274, 280 (5th Cir. 2017).

The Officers argue that summary judgment is proper on this claim because the competent summary judgment evidence establishes that EMS was requested immediately after Plaintiff's neck injury. (D.E. 42, p. 17–18). In support, the Officers cite three cases for the proposition that an officer who calls for EMS after an injury is ordinarily not deliberately indifferent to a person's medical needs. *Id.* (first citing *McIntosh v. Smith*, 690 F. Supp. 2d 515, 529–30 (S.D. Tex. 2010)

24 / 27

(Lake, J.); then citing *Fortune v. McGee*, 606 F. App'x 741, 743–44 (5th Cir. 2015); *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003), *overruled in part on other grounds by Pearson*, 555 U.S. 223).

Plaintiff responds that despite the Officers' knowledge of his injury, "no officer provided any medical care." (D.E. 48, p. 18). Plaintiff elaborates that all the officers present "failed to provide medical care . . . even minimal care of removing handcuffs, since he was not committing a crime, or providing first aid." *Id.* at 19. Finally, Plaintiff "begged for medical assistance. EMS arrived but were aggressive and unhelpful to him, he did not feel safe, and he elected to have his girlfriend [Ms. Sendejo] take him to the emergency room instead." *Id.* at 20.

Summary judgment is proper on Plaintiff's deliberate indifference claim. The basic facts surrounding this claim are not in dispute. Officers Allen and Balerio brought Plaintiff to the ground, after which he repeatedly exclaimed that the Officers had broken his neck. (D.E. 42-1, Ex. 1, 17:10:58–17:11:16). And Plaintiff explicitly said, "Get me an ambulance." *Id.* at 17:11:19–17:11:22; (D.E. 42-1, Ex. 5, 17:11:20–17:11:22). When Officer Balerio attempted to lift Plaintiff into a seated position, Plaintiff shouted in pain. (D.E. 42-1, Ex. 1, 17:11:26–17:11:31); (D.E. 42-1, Ex. 5, 17:11:27–17:11:30). So, Officer Balerio stopped trying to lift Plaintiff and said, "Okay then, lay down." (D.E. 42-1, Ex. 1, 17:11:31–17:11:32); (D.E. 42-1, Ex. 5, 17:11:30–17:11:32). Seven minutes after his initial request for an ambulance, Plaintiff instructed the officers not to call an ambulance. (D.E. 42-1, Ex. 1, 17:18:34–17:18:36).

Twelve minutes after Plaintiff initially asked for an ambulance, and five minutes after he instructed the Officers not to call an ambulance, the Officers requested EMS. *Compare* (D.E. 42-1, Ex. 8, 17:11:21–17:11:22), *with* (D.E. 42-1, Ex. 4, 22:23:09–22:23:23), *and* D.E. 42-1, Ex. 1, 17:18:34–17:18:36). EMS arrived to assess Plaintiff's neck at approximately 5:31 p.m. (D.E. 42-

25 / 27

1, Ex. 2, 17:31:51–17:31:58).[12] Plaintiff refused treatment from the EMS. (D.E. 42-1, Ex. 3, 17:33:22–17:33:53) (repeatedly instructing EMS to "let it go," "get away," and "get out of here"); *see also* (D.E. 48-1, p. 4) ("I decided to make the decision of having my wife take me instead of EMS because they were aggressive and unhelpful to me."); (D.E. 48-2, p. 4) (Ms. Sendejo declaring she heard Plaintiff deny EMS's assistance "because he didn't feel safe due to the way they handled him."). After Officer Balerio released Plaintiff from his handcuffs, (D.E. 42-1, Ex. 10, 17:37:41–17:37:57), Ms. Sendejo drove Plaintiff to the hospital. (D.E. 48-1, p. 4; D.E. 48-2, p. 4). At the hospital, Plaintiff received a CT scan, which revealed he had sustained a fracture in his neck at the C6 vertebra. (D.E. 48-3, p. 3, 5–11).

The Officers were not deliberately indifferent because they did not deliberately delay requesting EMS after Plaintiff complained of his neck injury. *See Fortune*, 606 F. App'x at 743–44 (rejecting deliberate indifference claim against defendant who "called for an ambulance as soon as he realized [plaintiff] was in distress"); *Mace*, 333 F.3d at 626 (affirming summary judgment dismissal of deliberate indifference claim where defendant had summoned ambulance and plaintiff "offer[ed] no evidence showing that [defendant] intended to cause delay by having the officer drive the ambulance or was otherwise indifferent to [plaintiff's] condition"); *McIntosh*, 690 F. Supp. 2d at 529–30 (granting summary judgment dismissal of deliberate indifference claim where plaintiff "ha[d] not offered any evidence from which a reasonable fact-finder could conclude that [defendant] deliberately delayed either the call for medical aid or the arrival of medical aid").

The undisputed facts show the Officers waited seven minutes, then Plaintiff instructed the

---

[12] The Parties dispute why Plaintiff refused treatment from the EMS. The Officers characterize Plaintiff as "hostile towards the EMS personnel," (D.E. 42, p. 17); Plaintiff characterizes the EMS personnel as "aggressive" and "unhelpful," (D.E. 48, p. 20). This disagreement is immaterial because it does not affect whether the officers were deliberately indifferent.

26 / 27

Officers not to call EMS, and five minutes later, the Officers requested EMS. This five-minute delay, alone, is insufficient to show the Officers were deliberately indifferent. As such, the Officers were not deliberately indifferent to Plaintiff's medical needs and are entitled to qualified immunity on this claim. Accordingly, the Court **GRANTS** summary judgment as to Plaintiff's deliberate indifference claim.

### V. Conclusion

For the reasons stated above, the Officers' motion for summary judgment, (D.E.42), is **GRANTED in part** and **DENIED in part**. The Officers' motion for summary judgment is **GRANTED** as to Plaintiff's due process, false arrest, deliberate indifference, and bystander claims and **DENIED** as to Plaintiff's excessive force claim.

SO ORDERED.

DAVID S. MORALES
UNITED STATES DISTRICT JUDGE

Signed: Corpus Christi, Texas
July 10, 2026